Good morning, your honors. May it please the court. My name is Richard Kling. I represent Jason Austin. From the standpoint of Jason Austin or somebody situated in his shoes, Judge Lefkoe gave him the worst possible trial that she could give, and that was an overwhelmingly fair trial, which is the reason that there is no issue as to the trial. He received the fairest of possible trials. There's not one issue before this court. Her fairness continued into the sentencing hearing, which is before this court, but despite her fairness, I believe that the matter has to be remanded for further findings. In order to sentence Mr. Austin, based on the quantity of drugs which she took into consideration, she has to base it on reliable evidence. As this court knows in U.S. v. Garrett from this court and in Acosta from this court 20 years earlier, it has to be reliable evidence. I would suggest to your honors that there was absolutely no reliable evidence. Now if you're sitting up there and saying, Kling, why did you spend so much time with respect to the murders? That's not before the court. Here's the reason I spent so much time with respect to the murders. The witnesses who testified on the murders, and particularly Jeffrey Scott, were the sole basis of Judge Lefkoe's decision on the quantity of drugs. She based it on Jeffrey Scott. She said, yes, there was corroborating evidence from Troy Davis, and yes, there was corroborating evidence from Kevin Terry Jr. I would suggest to your honors that you can't add to a liar pieces of corroborating evidence and make the lie not a lie. Why do I suggest that Jeffrey Scott is a liar? I can go down the list which I did in my brief. The description the dying officer Soto gave of the car from which shots were fired and caused the death of him and the worker that he was with, the maroon car. Mr. Kling? A bunch of witnesses from the very beginning said they saw, yes. It's pretty, the judge's explanation of her thinking on this was pretty thorough and careful. She obviously was fully aware of credibility problems with Mr. Scott. Where's the clear error? Even somebody who is a confessed, proven beyond a shadow of a doubt liar, sometimes can tell the truth and sometimes can be believed, and there was a large drug trafficking organization under Mr. Austin's control for a significant period of time, right? There was a large drug trafficking organization under Mr. Austin's control for a significant period of time, yes. However, again, the determination, go on. Where's the clear error? Okay, the clear error is that she had to have based her conduct under 1B1.3a, she had to have based it on reliable evidence based on this court's decisions in Garrett and Acosta. She did not have reliable evidence. Jeffrey Scott was caught in lying on the witness stand, and here's the reason in my brief, and here's the reason I say to you, that the government was essentially between a rock and a hard place with Jeffrey Scott. Jeffrey Scott testified on the witness stand in direct examination, essentially that the police officer after police officer after police officer from the Chicago Police Department came in and said, we essentially treated these people as invited guests, that they stayed voluntarily for three days in cinder block, eight by six rooms, where they slept on a metal bench. Are you talking about the murder investigation? I'm talking about the murder investigation, and, but these witnesses were also witnesses with respect to the drug investigation, including Jeffrey Scott. Jeffrey Scott got up on the witness stand in the I think, quite frankly, and that's an issue for a different day, is whether the rules should be amended to allow cross-examination and the rules of evidence should apply to sentencing hearings, but they don't, and I'm aware of that. But the bottom line is that Jeffrey Scott got up on direct examination and essentially said the police treated him fine. On cross-examination, as Mr. Madden correctly points out, he says he wasn't beaten, but he then goes on to say that he was slapped, he was kicked, he was punched, his hands were balled up in smashed up against the metal filing cabinet, that every single one of the allegations, Mr. Madden, the government argues that these were all orchestrated by Jason Austin and by his lawyer at the time, that is the state court lawyer for Jason Austin. The fact of the matter is, is Jeffrey Scott, under oath, in front of Judge Lefkoe, said every one of the allegations that were filed in IPRA and every one of the allegations that were filed in the civil suit were the God's honest truth, that they happened to him, that nobody told him to say those things, he said those things because that's what happened. And the rock and the hard place that the government was between, quite frankly, is they couldn't argue that Jeffrey Scott was a liar, because if they argued that Jeffrey Scott was a liar, then their case falls. Yes, liars can be honest as to some things, but the bottom line is his inconsistencies, his description of what his brother Terrence supposedly told him regarding whether it was a green minivan that was a getaway car, and on and on down the line, the surveillance cameras which belie his testimony. If the government argued that Jeffrey Scott was a liar about the police conduct, how could they expect Judge Lefkoe to believe him on anything else? If the government got up there and said Jeffrey Scott was telling the truth about police misconduct, then how could you believe the police officers and their statements which were introduced through exhibits and the statements of witnesses they interrogated? And the government, I think, took the only position they could take, which is the strangest condition, the of murder cases. Jeffrey Scott says he was beaten, the police say he wasn't, we weren't there, we don't know what happened. I would suggest to your honors that if they don't know what happened and the evidence is clear that they don't know what happened, how could Judge Lefkoe say she has reliable, credible evidence? Because they're different subjects. The answer, I think, is because they're different subjects. You've got a client there, a witness with terrible credibility problems, especially related to the investigation of the murders that she found your client very likely committed. But we also have pretty clear objective evidence that he's running this large-scale heroin distribution operation for at least a couple of years. That's going to get him up above 10 kilos, right? Well, the other problem you have there is the 3B1.1A analysis, and that is in taking into consideration relevant conduct. She can take into consideration relevant conduct that occurred during the offense of the conviction. Based on a Yenny and Carter, the offense of which he was convicted was conspiracy to distribute less than a hundred grams. That's the offense. Now, you're trying to debate the effects of the acquittal, and we've got pretty clear law on that, right? No, you do have pretty clear law on that. I'm not trying to debate that at all. What I'm saying is, unfortunately, Judge Lefkoe never articulated when the conspiracy began and when the conspiracy ended that was the conspiracy to distribute less than a hundred grams. If you can consider relevant conduct during that period of time, then the question is, what's the period of time? A conspiracy begins at a particular time, ends at a particular time, and particularly the conspiracy to distribute less than a hundred grams. And the problem is there were many acts that concededly Jason Austin developed himself, but there's no articulation as to whether the relevant conduct in which she based the quantity occurred before the conspiracy, after the conspiracy to distribute less than a hundred grams, or during the conspiracy to distribute less than a hundred grams. And so for those reasons, based on the lack of articulation of when the conspiracy was, and specifically what he was doing during that period of time, and based on the absolute incredible evidence of reliability under the decisions of this court, I respectfully request that the matter be remanded to Judge Lefkoe for further proceedings. Thank you. Okay, thank you, Mr. Klein. Mr. Madden? May it please the court, Matthew Madden on behalf of the United States. I'd like to start with an observation. Challenges to district court credibility determinations on witnesses are almost never successful on appeal. And the reason that's so is because this court grants very substantial deference to district court judges, the fact-finders, credibility determinations. And there's really good reason for that, because so much of what is necessary to assess the credibility of a witness is not apparent in the cold record that what we have on appeal. For example, if a witness, especially how a discredited. Pardon me? That is so discredited. I don't understand. The notion that demeanor helps you determine whether someone is telling truth. The people who study this say that that it is much better to read a transcript of someone's testimony than to see him testify. Because if you see him testify, you're distracted by all Well, your honor, in this case, the district court judge, what was unusual about this case, your honor, is the district court had two very lengthy opportunities to both observe and listen to the testimony of the cooperating witness. If she had read a transcript of his testimony, that would probably have been a more reliable basis for drawing inferences of truth or falsehood than watching the person. Well, your honor, she had both opportunities, your honor. Yeah, but look, the problem is, you know, our judicial system is largely based on 19th century psychology. So what modern psychologists have found is that when you're watching and looking at a person, that's a distraction. But when you read a transcript of the person's testimony, there's nothing to distract you from the, you know, whether it's consistent and seems informed and so on. Well, what I would suggest, regardless of whatever the science is, your honor, Judge Lefkoe had both in this case because she had the benefit not only of observing him in court. But that's not a benefit, don't you understand? Mr. Madden, would you agree that evaluation of credibility in this kind of a problem is really a holistic venture where sometimes demeanor is reliable. Some people are good at detecting liars that way. Most are not. That's my understanding of the science. But it's usually a lot better to try to make those kinds of evaluations in terms of the totality of the evidence. What are other witnesses saying? How do you fit the whole package together and try to evaluate the extent, in this case, of the defendant's wrongdoing? Absolutely. And that's exactly what the district court judge did in this case when she made those thorough findings at sentencing. She noted that she found Scott's testimony to be credible, but she also said that it was corroborated by the other evidence here. So it wasn't just Scott's testimony. But one thing I will say about his testimony is that his testimony was very detailed. It wasn't just some generalized testimony that, you know, five bundles were sold for four years. He actually went into a very high level of detail, breaking it down oftentimes, I think, into like five or six periods within a year and a half and described in detail what was going on at the spot at those times, which led to the increases and decreases of the heroin salt. So he went into that level of detail. She also had the benefit of video surveillance that the government had introduced into evidence. She had the benefit of post-arrest statements by several other defendants who described very large quantities of heroin, up to 7,000 or 8,000 a day of heroin being sold at the spot, and 8,000 was the high end of Jeffrey Scott's testimony. That's dollars? Dollars, yeah. It was a dollars-per-day estimate. And that was consistent with his testimony. So he was the substance of his testimony was corroborated, and, of course, the district court had discretion to credit that testimony. She made very detailed findings in that regard. The other thing I'll say about that, in terms of the attack in this case, so much of it is an indirect attack. The inconsistencies he's talking about, what he's really challenging, are what Jeffrey Scott said about the murder as opposed to what other witnesses said about the murder. So what I'll say about that is almost nothing has been challenged in terms of what Jeffrey Scott said on the drug quantity because there weren't inconsistencies. He was consistent in how he described the drug spot and the amounts of drugs that were sold there. And so this whole attack is doubly weak because it's so focused on because he lied about the murder, you can't rely on what he said about the drug quantity when, in fact, he was consistent about the drug quantity. So that's another reason why this court should affirm the district court's ruling with respect to drug quantity. And he did not address the leader organizer, so I will pass on that unless the court wants me to address that, and I'll ask the court to affirm the sentence in this case. Did the government make a sentencing recommendation? We did, Your Honor. What was that? In fact, it changed. Initially, I believe we'd asked for, in our written brief, I believe we asked for a sentence of 40 years. And then when we, after assessing the evidence and putting on the evidence at the sentencing, which was a lengthy six-day sentencing, at the beginning of that sentencing, we let Judge Lefkoe know that we were actually going to ask for a sentence of life imprisonment. And the pre-sentence report, did it recommend a sentence? I don't believe that we saw the, sometimes we get the recommendation, sometimes we don't. I assume when you get it, the defense also gets it. They do, yes. Because different judges have different practices. Exactly. It's a newer practice. I don't know if we got it in this case. I don't think we did. But I know that the pre-sentence report concluded that his guidelines were life, which was consistent with the government's position. Well, they don't, but probation doesn't always recommend a guideline sentence. That's true. Almost always. What they do is, and for a long time the parties would never see this, but there's a separate recommendation that goes to district court judges, and until recently we never saw that. More recent practice here is that in some cases we do see that, in some cases we don't. And I don't know for sure if we saw that in this case. Now, how old was he when he was sentenced or when he was, you know, imprisoned? Low 30s, Your Honor. I think he was late 20s at the time of the offense, and he's in his 30s still. I think he's in his low 30s right now. Well, what's the point of imprisoning someone in a violent person into his 70s? He's unlikely to be committing violent crimes in his 70s, isn't he? Well, I think he'll be, I think he'd probably be in his 60s, because if he serves 85% of 35 years, he's actually been. Well, what makes you think he'll get his maximum good time credits? Well, most people do. I don't know that. They do, right? Even the violent people like him? That I don't know. Huh. But, you know, Your Honor, the district courts, it was a lengthy sentence, obviously. Thirty-five years is a very lengthy sentence. But in this case, with someone who had shown it was not just the murders, numerous violent acts, escalating acts of violence, and in and out of prison, and simply not being deterred by his prior sentences, there was good reason to give him a very lengthy sentence. Well, is there a good reason in the sense of specific deterrence? That is, would you expect him to come out in his 60s or 70s and be murdering people or trading drugs, which is, of course, dangerous? I thought people aged out of violent criminal activity. Well, what we know about this defendant is that he was exceptional in the sense that he was very regularly and consistently committing new violent acts after he's incarcerated. So that's what we know about him. So even if the statistics do show that as people get older, they tend to age out of violence, this is a defendant where what we know about him is he's exceptional and the judge had good reason to give him a 35-year sentence in this case, Your Honor. Okay. Well, thank you, Mr. Madden. Thank you. So, Mr. Klain? Just a couple of points, Your Honors. Number one, Mr. Madden says that district judges are given great deference regarding credibility, and they are, and I don't quarrel with that proposition. But district judges are also human, and they sometimes make mistakes. Sometimes? Maybe less than sometimes, or more. Once in a while they make mistakes. We make mistakes, too. And I think Judge Lefkoe made a mistake in this case. She based credibility on somebody who was not credible. The murder case, and just quick mention that murder case, as I mentioned in my brief, was Nally Pross by the State of Illinois.  Evidence was shown that Mr. Austin probably did not commit the murder, and I would love to try the murder trial, but I never had an opportunity because the rules of evidence didn't permit me to do it in the sentencing hearing. But it's very difficult to review a credibility determination. As Judge Hamilton said, you know, you have people who are basically very unreliable, but that doesn't mean that everything they say is a lie. That's correct. Mr. Madden says Jeffrey Scott was consistent. I would submit, Judge, that in the 15 statements which he gave, some of which were regarding the murder and some of which were regarding the drug dealings, eight of them before the plea agreement was offered to him were consistent that Mr. Austin had nothing to do with it. Once the plea agreement was given, he gave seven more statements which said Mr. Austin was responsible for the drug dealing as well as the murder, and he was caught in a lie on the stand. And I don't see how Judge Lefkoe, as fair as she was, and she was wonderfully fair, can base a decision of credibility and reliability on a caught perjurer. Thank you. Were you appointed? I was. Okay. Mr. McLean, well, we thank you for your efforts on behalf of your client, and we thank Mr. Madden as well for his efforts.